**Everett HADIX, et al., Plaintiffs–Appellees,**

v.

**Perry M. JOHNSON, et al., Defendants–Appellants (96–1851/1908/1943),**

**United States of America, Intervenor (96–1908/1943).**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**STATE OF MICHIGAN, et al., Defendants–Appellants (96–1907).**

Nos. 96–1851, 96–1943, 96–1907 and 96–1908.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 4, 1997.

Decided May 20, 1998.

---

Susan Przekop–Shaw (argued and briefed), Michael A. Nickerson (briefed), Office of the Attorney General, Corrections Division, Lansing, MI, for Defendant–Appellant Perry Johnson in No. 96–1851.

Susan Przekop–Shaw (argued and briefed), Leo H. Friedman, Office of the Attorney General, Corrections Division, Lansing, MI, for Defendants–Appellants in Nos. 96–1907 and 96–1908.

Lisa C. Ward, Asst. Atty. Gen., Susan Przekop–Shaw (argued and briefed), Leo H. Friedman, Office of the Attorney General, Corrections Division, Lansing, MI, for Defendant–Appellant Perry Johnson in No. 96–1943.

Patricia A. Streeter (briefed), Detroit, MI, Deborah A. LaBelle (argued and briefed), Law Offices of Deborah LaBelle, Ann Arbor, MI, Michael Barnhart (briefed), Detroit, MI, for Plaintiff–Appellee Everett Hadix in No. 96–1851.

Lisa J Stark, Marie K. McElderry, (argued and briefed), Special Litigation Section, Steven H. Rosenbaum (briefed), U.S. Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, for Plaintiff–Appellee.

Patricia A. Streeter (briefed), Detroit, MI, Elizabeth R. Alexander, Chief Staff Counsel (argued and briefed), National Prison Project, Washington, DC, Deborah A. LaBelle (argued and briefed), Law Offices of Deborah LaBelle, Ann Arbor, MI, Michael Barnhart (briefed), Detroit, MI, for Plaintiff–Appellee Everett Hadix in No. 96–1908.

Patricia A. Streeter (briefed), Detroit, MI, Deborah A. LaBelle (argued), Law Offices of Deborah LaBelle, Ann Arbor, MI, Michael Barnhart (briefed), Detroit, MI, for Plaintiff–Appellee Everett Hadix in No. 96–1943.

Marie K. McElderry (argued and briefed), U.S. Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, for Intervenor.

Before: MARTIN, Chief Judge; NORRIS and MOORE, Circuit Judges.

MOORE, J., delivered the opinion of the court, in which MARTIN, C. J., joined. NORRIS, J. (pp. 950–952), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

MOORE, Circuit Judge.

We are called upon in this appeal to perform the delicate task of determining whether Congress unconstitutionally encroached into matters reserved for the Judiciary in enacting the automatic stay provision of the Prison Litigation Reform Act ("PLRA" or "Act"), Pub.L. No. 104–134, 110 Stat. 1321–66 (1996), as amended by the Department of the Judiciary Appropriations Act of 1998, Pub.L. No. 105–119, § 123, 111 Stat. 2440, 2470 (1997). 18 U.S.C. § 3626(e) (as amended in 1997). Under the PLRA, the filing of a motion to terminate a prison conditions con-

sent decree triggers an automatic stay of all prospective relief under the decree on the thirtieth day after the filing of the motion, or the ninetieth day after the filing should the court postpone the effective date of the automatic stay by sixty days for good cause. *See* 18 U.S.C. § 3626(e)(2)-(3) (as amended in 1997). The automatic stay remains effective until the court rules on the termination motion. *See* 18 U.S.C. § 3626(e)(2).

In these consolidated cases the Michigan Department of Corrections moved to terminate longstanding consent decrees and sought to have prospective relief under the decrees automatically stayed pending resolution of the motions. The district courts invalidated the PLRA automatic stay provision on separation-of-powers and due process grounds. During the pendency of this appeal, Congress enacted Pub.L. No. 105–119, § 123, 111 Stat. 2440, 2470 (1997), which amended the PLRA's automatic stay provision. The prisoners and the Department of Justice argue that under the amended statute Congress implicitly recognizes the inherent power of the courts to suspend the automatic stay in accordance with generally applicable equity standards, an interpretation with which the state officials disagree.

We believe the state officials' construction of the PLRA's automatic stay provision violates the separation-of-powers doctrine because under their interpretation, the automatic stay amounts to a direct legislative suspension of a judicial order and, alternatively, intrudes impermissibly into the effective functioning of the Judiciary under certain circumstances. In contrast, the reasonable construction espoused by the prisoners and the Department of Justice does not violate separation-of-powers principles. Accordingly, we hold that the PLRA automatic stay provision, as construed to permit the courts to exercise their inherent equitable powers, does not give rise to an unconstitutional incursion by

Congress into the powers reserved for the Judiciary. The parties also raise several other issues that we address below, including whether the attorney fees provisions of the PLRA should apply retroactively to pre-enactment conduct.

## I. FACTS AND PROCEDURAL HISTORY

In 1980, Everett Hadix and other prisoners incarcerated at the State Prison of Southern Michigan, Central Complex ("SPSM–CC") brought a class action suit pursuant to 42 U.S.C. § 1983 in the U.S. District Court for the Eastern District of Michigan against various state officials charged with the operation of SPSM–CC. The inmates asserted that their conditions of confinement violated their rights under the First, Eighth, Ninth, and Fourteenth Amendments. Five years later, the parties entered into a comprehensive consent decree covering most aspects of prison life, including medical and mental health care; fire safety; sanitation; safety and hygiene; overcrowding and protection from harm; volunteers; food service; management; operations; access to courts; and mail. The *Hadix* consent decree specifically excluded from the decree issues concerning classification [1]; due process; visitation; and access to courts as it relates to the provision of attorneys. *See* Joint Appendix (J.A.) # 96–1943 at 109–58. Though the state officials admitted no liability on the inmates' claims, the decree explicitly stated that it was "intended by the parties to assure the constitutionality of the conditions under which prisoners are incarcerated at SPSM–CC." J.A. # 96–1943 at 109. Under the decree's terms, the state officials could apply for termination of the decree when they were in compliance with all decree provisions. *See* J.A. # 96–1943 at 145. U.S. District Judge John Feikens approved the decree, ruling that it was both fair and reasonable. He has since issued several orders implementing the *Hadix* decree, several of which have been the subject of appeals to this court.[2]

---

**1.** By stipulation the classification issue was referred for resolution in the *United States v. Michigan* parallel consent decree. *See Hadix v. Johnson*, 943 F.2d 51 (6th Cir.1991).

**2.** Some of Judge Feikens's orders have involved implementing a plan to break up SPSM–CC into

five autonomous units. Phase I of the break-up has been implemented. On September 19, 1996, this court issued a partial stay that relieved the defendants of their obligation to implement Phases II and III pending this appeal.

In 1982, the United States Department of Justice[3] began an investigation of conditions in certain Michigan prisons pursuant to the Civil Rights of Institutionalized Persons Act of 1980 ("CRIPA"), 42 U.S.C. § 1997, et seq. Two years later, after extensive investigation and negotiation with Michigan officials, the Justice Department filed a complaint in the U.S. District Court for the Western District of Michigan against the State of Michigan and various Michigan officials alleging that conditions in five Michigan prisons (SPSM–CC, State Prison of Southern Michigan Trusty, Charles Egeler Facility, Marquette Branch Prison, and Michigan Reformatory) violated the constitutional rights of the prisoners confined therein. The issues were never adjudicated; simultaneously with the filing of the complaint, the United States tendered a proposed consent decree and a "State Plan for Compliance." The United States agreed that implementation of the State Plan for Compliance would be adequate to bring the defendants into full compliance with the consent decree. U.S. District Judge Richard A. Enslen approved a revised version of the tendered decree that covered medical and mental health care; fire safety; sanitation; safety and hygiene; crowding and protection from harm; access to courts; and legal mail. *See United States v. Michigan*, 680 F.Supp. 928, 955 (W.D.Mich.1987); J.A. # 96–1907 at 181–92.

In the interest of uniformity, the medical and mental health care components of the *Hadix* decree were transferred in 1992 and 1993 from Judge Feikens in the Eastern District to Judge Enslen in the Western District. Judge Enslen has entered several orders implementing the *USA* decree and his portion of the *Hadix* decree.

In April 1996, Congress enacted the Prison Litigation Reform Act ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321–66 (1996), amending 18 U.S.C. § 3626. Enacted in part in response to criticisms that federal courts had overstepped their supervisory authority in prison conditions cases, the PLRA was specifically intended to limit the use of court-enforced consent decrees and to restrict "the ability of Federal judges to affect the capacity and conditions of prisons and jails beyond what is required by the Constitution and Federal law." *See* H.R.REP. No. 104–21, at 21 (1995). Section 802(a)(1) of the Act directs that prospective relief in prison conditions cases "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). Correspondingly, § 802(b)(2) of the Act entitles the defendant "to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(b)(2). Such prospective relief, however, "shall not terminate if the court makes written findings based on the record that prospective relief remains necessary[, narrowly drawn, and the least intrusive means] to correct a current and ongoing violation of the Federal right." 18 U.S.C. § 3626(b)(3) (as amended in 1997).

On the basis of their new-found rights under the PLRA, the defendants moved to terminate the *Hadix* and *USA* decrees pursuant to 18 U.S.C. § 3626(b)(2). The defendants sought to take advantage of a provision in the PLRA that at the time of their motion instituted an automatic stay of prospective relief thirty days after the filing of a such a motion. *See* 18 U.S.C. § 3626(e)(2) (1996), *amended by* Pub.L. No. 105–119, § 123, 111 Stat. 2440, 2470 (1997).[4] The defendants asserted that on the thirtieth day after the

---

3. The United States is involved in this appeal as a direct party in the *USA* suit, as amicus in the health care portions of the *Hadix* suit in the Western District, and as an intervenor in both the Eastern and Western Districts on the issues regarding the constitutionality of the PLRA automatic stay provision.

4. Before the 1997 amendments, § 3626(e) provided in pertinent part as follows:
 (1) Generally.—The court shall promptly rule on any motion to modify or terminate prospective relief in a civil action with respect to prison conditions.
 (2) **Automatic stay.**—Any prospective relief subject to a pending motion shall be automatically stayed during the period—
 (A)(i) beginning on the 30th day after such motion is filed, in the case of a motion made under paragraph (1) or (2) of subsection (b);
 ... and
 (B) ending on the date the court enters a final order ruling on the motion.

filing of their termination motions, unless the court had made the findings required by § 3626(b)(3) during that period, all prospective relief under the decree would be automatically stayed pending the courts' rulings on the motions.

The district courts refused to allow the automatic stay to take effect in these cases, ruling that the automatic stay provision violated the separation-of-powers doctrine and the Due Process Clause of the Fifth Amendment. *See Hadix v. Johnson,* 933 F.Supp. 1360 (E.D.Mich.1996); *Hadix v. Johnson,* 933 F.Supp. 1362 (W.D.Mich.1996). Following the rulings, the defendants unsuccessfully moved in this court for emergency stays and mandamus relief to block the district courts from holding evidentiary hearings on the termination motions.

After this case was submitted to this court on appeal, Congress enacted Pub.L. 105–119, § 123, 111 Stat. 2440, 2470 (1997), which amended the PLRA's automatic stay provision. Whereas prior to the amendments the automatic stay provision instituted an automatic stay of all prospective relief on the thirtieth day after the filing of a motion to terminate such relief, the amended provision additionally permits a court to "postpone the effective date of an automatic stay ... for not more than 60 days for good cause." § 123(a)(3)(c), 111 Stat. at 2470, amending 18 U.S.C. § 3626(e). Good cause does not include "general congestion of the court's calendar." *Id.* Although the amended provision enables a court to extend for good cause the effective date of the automatic stay by sixty days, it still provides that a courtenforced consent decree will be automatically stayed if the court fails to make the findings required by § 3626(b)(3) within the prescribed time period. Congress also added a subsection providing for interlocutory appeal of "[a]ny order staying, suspending, delaying, or barring the operation of the automatic stay," other than an order postponing the stay for up to sixty days pursuant to § 3626(e)(3).[5] § 123(a)(4), 111 Stat. at 2470, amending 18 U.S.C. § 3626(e).

Subsequent to the congressional amendments to the PLRA automatic stay provision, the prisoners suggested that these appeals were now moot. We asked the parties to provide supplemental briefing discussing the effect of the amendments on these cases, specifically addressing the retroactive application of the amended statute, the authority the amended provision grants to a district court, the prisoners' claim of mootness, and whether the amendments affect the constitutionality of the automatic stay provision.

## II. PRELIMINARY ISSUES

The primary issue now before us is whether the automatic stay provision of the PLRA is constitutional. The plaintiffs, however, raise preliminary issues that must be addressed.

### A. Jurisdiction

As an initial matter, the plaintiffs claim that we lack jurisdiction over this appeal because the denial of a stay is not an appealable interlocutory order under 28 U.S.C. § 1292(a)(1),[6] nor an appealable order

---

5. The amended version of § 3626(e) provides in pertinent part as follows:

(1) Generally—The court shall promptly rule on any motion to modify or terminate prospective relief in a civil action with respect to prison conditions....

(2) Automatic Stay—Any motion to modify or terminate prospective relief made under [§ 3626(b)] shall operate as a stay during the period—

(A)(i) beginning on the 30th day after such motion is filed under, in the case of a motion made under paragraph (1) or (2) of subsection (b); ... and

(B) ending on the date the court enters a final order ruling on the motion.

(3) Postponement of Automatic Stay—The court may postpone the effective date of an automatic stay specified in subsection (e)(2)(A) for not more than 60 days for good cause. No postponement shall be permissible because of general congestion of the court's calendar.

(4) Order Blocking the Automatic Stay—Any order staying, suspending, delaying, or barring the operation of the automatic stay described in paragraph (2) (other than an order to postpone the effective date of the automatic stay under paragraph (3)) shall be treated as an order refusing to dissolve or modify an injunction and shall be appealable pursuant to section 1292(a)(1) of title 28, United States Code, regardless of how the order is styled or whether the order is termed a preliminary or a final ruling.

6. Under 28 U.S.C. § 1292(a)(1), "the courts of appeals shall have jurisdiction of appeals from: [i]nterlocutory orders of the district courts ...

under the collateral order exception to 28 U.S.C. § 1291.[7] The recent amendments to the PLRA's automatic stay provision provide that "[a]ny order staying, suspending, delaying, or barring the operation of the automatic stay ... shall be treated as an order refusing to dissolve or modify an injunction and shall be appealable pursuant to section 1292(a)(1) of title 28, United States Code, regardless of how the order is styled or whether the order is termed a preliminary or a final ruling." Pub.L. No. 105–119, § 123(a)(c)(3), 111 Stat. 2440, 2470 (1997). A court must "apply the law in effect at the time it renders its decision," *Bradley v. Richmond Sch. Bd.,* 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), unless doing so affects "substantive rights, liabilities, or duties [pertaining] to conduct arising before their enactment." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 278, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Application of a new statute giving jurisdiction to the courts "takes away no substantive right," *Hallowell v. Commons,* 239 U.S. 506, 508, 36 S.Ct. 202, 60 L.Ed. 409 (1916) (quoted in *Landgraf,* 511 U.S. at 274, 114 S.Ct. 1483), but simply "speak[s] to the power of the court rather than to the rights or obligations of the parties." *Landgraf,* 511 U.S. at 274, 114 S.Ct. 1483 (quotation omitted); *see also Figueroa–Rubio v. INS,* 108 F.3d 110, 112 (6th Cir.1997) (concluding that statute regulating courts' jurisdiction affected power of courts rather than substantive rights of parties).

We therefore conclude that the recent amendments to the PLRA explicitly vest this court with the power to review a district court order barring the operation of the automatic stay prior to the termination of the underlying litigation, thereby providing a specific statutory authorization for immediate appellate review. We need not decide whether the collateral order doctrine affords an additional basis for immediate appellate review.

### B. Mootness

■ During the pendency of this appeal, Congress enacted Pub.L. No. 105–119, § 123,

111 Stat. 2440, 2470 (1997), amending § 802(e) of the PLRA. The prisoners assert that these amendments to the PLRA's automatic stay provision render this case moot. *See* Pls.-Appellees' Mem. in Supp. of Suggestion of Mootness. We disagree.

■ The case or controversy requirement continues through all stages of the litigation. *See Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). To sustain our appellate jurisdiction, "it is not enough that a dispute was very much alive when suit was filed[;][t]he parties must continue to have a personal stake in the outcome of the lawsuit." *Id.* at 477–78, 110 S.Ct. 1249 (quotation omitted). "[A] controversy does not cease to exist by mere virtue of a change in the applicable law." *Public Serv. Co. of Col. v. Shoshone–Bannock Tribes,* 30 F.3d 1203, 1205 (9th Cir.1994). As the Supreme Court recognized in *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993), where the new statute is substantially similar to the old statute and operates in "the same fundamental way," the statutory change has not "sufficiently altered [the circumstances] so as to present a substantially different controversy," and the case is not moot. *Id.* at 662 & n. 3, 113 S.Ct. 2297; *see also Rosenstiel v. Rodriguez,* 101 F.3d 1544, 1548 (8th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1820, 137 L.Ed.2d 1028 (1997). In other words, where the changes in the law arguably do not remove the harm or threatened harm underlying the dispute, "the case remains alive and suitable for judicial determination." *Shoshone–Bannock Tribes,* 30 F.3d at 1205.

We conclude that the controversy in this case is not moot for two reasons. First, the parties dispute whether the PLRA's automatic stay provision as amended preserves the courts' traditional equity powers. The state officials contend that the statute displaces the courts' inherent powers in equity, whereas the prisoners, as well as the Justice

---

7. Under 28 U.S.C. § 1291, "[t]he courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States...."

granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions...."

Department, argue that § 4 of the automatic stay provision implicitly recognizes and preserves the courts' power to stay the automatic stay in accordance with equitable principles.

■ Second, under the statutory construction advocated by the state officials, the objectionable aspects of the automatic stay provision remain. Under the prior version of § 3626(e)(2), all prospective relief under the challenged consent decrees would be automatically stayed on the thirtieth day after the filing of a motion to terminate the decrees under § 3626(b)(3) pending the courts' rulings on the motion. Before the expiration of the thirty-day automatic-stay safety period, both district judges entered orders finding the PLRA's automatic stay provision constitutionally flawed under separation-of-powers and due process principles.[8] *See Hadix v. Johnson,* 933 F.Supp. 1360 (E.D.Mich. 1996) (Feikens, J.) (hereinafter *"Hadix I"*); *Hadix v. Johnson,* 933 F.Supp. 1362 (W.D.Mich.1996) (Enslen, J.) (hereinafter *"Hadix II"*). Both judges concluded that the consent decrees and associated orders affording prospective relief were "final judgments" protected from congressional interference under the holding of *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). *See Hadix I,* 933 F.Supp. at 1361; *Hadix II,* 933 F.Supp. at 1367. In light of the finality of the decrees and orders, .the district judges also

found that the automatic stay abrogated vested property rights without affording due process. *See Hadix II,* 933 F.Supp. at 1369; *Hadix I,* 933 F.Supp. at 1361–62 (concurring with *Hadix II* ). Moreover, the district judges believed that the automatic stay mandated the outcome ·of a pending case in an attempt by Congress to alter constitutional rights. *See Hadix II,* 933 F.Supp. at 1366– 67; *Hadix I,* 933 F.Supp. at 1361–62 (concurring with *Hadix II* ). If the PLRA as amended simply allows the courts to postpone by sixty days for good cause the effective date of the automatic stay without preserving the courts' equitable powers, *see* 18 U.S.C. § 3626(e)(3)-(4) (as amended in 1997), the amendments do not cure these objections, and the controversy between the parties regarding the constitutionality of such legislation continues in full force. Accordingly, we hold that the case is not moot.[9]

■ Where a change in law does not extinguish the controversy, the preferred procedure is for the court of appeals to remand the case to the district court for reconsideration of the case under the amended law. *See Concerned Citizens of Vicksburg v. Sills,* 567 F.2d 646, 650 (5th Cir.1978); *Korn v. Franchard Corp.,* 456 F.2d 1206, 1208 (2d Cir.1972); *cf. Faries v. Director, Office of Workers' Compensation Programs,* 909 F.2d 170, 173 (6th Cir.1990) (holding that where the administrative law judge or Benefits Review Board erred by applying an incorrect

---

**8.** Both district courts properly rejected non-constitutional grounds for their decisions. Judge Enslen concluded that the automatic stay provision does not directly conflict with either Rule 60(b) or Rule 62(b) of the Federal Rules of Civil Procedure. *See Hadix II,* 933 F.Supp. at 1365; *see also* 28 U.S.C. § 2072(b). Judge Feikens declined to suspend the effect of the automatic stay provision pursuant to the All Writs Act, 28 U.S.C. § 1651(a). *See Hadix I,* 933 F.Supp. at 1361.

**9.** Judge Feikens issued an order on November 1, 1996 that found the immediate termination provisions of the PLRA, 18 U.S.C. § 3626(b)(2), (b)(3), unconstitutional on separation-of-powers grounds and denied the defendants' motion to terminate the consent judgment under § 3626(b)(2) and Rule 60(b). *See Hadix v. Johnson,* 947 F.Supp. 1100 (E.D.Mich.1996). On November 18, 1996, Judge Enslen entered a similar order for the *Hadix* and *USA* decrees pending in his court, but reserved final determination pend-

ing this appeal. *See* Appellants' Reply Br. at 2. *Hadix v. Johnson,* 965 F.Supp. 996 (W.D.Mich. 1996), *appeal dismissed for want of jurisdiction,* 134 F.3d 371 (Table), 1998 WL 30820 (6th Cir. 1998). Although the inmates had previously suggested that part of this appeal was rendered moot by the district courts' resolution of the underlying motion to terminate the consent decree, this circuit's recent opinion holding the immediate termination provisions constitutional and directing the district court to reconsider the state officials' termination motion forecloses the inmates' mootness argument. *See Hadix v. Johnson,* 133 F.3d 940 (6th Cir.1998). Moreover, the matter before us is justiciable as an exception to the mootness doctrine as a scenario capable of repetition yet evading review. *See Southern Pacific Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911) (maintaining jurisdiction over "shortterm orders, capable of repetition, yet evading review" that otherwise may forever defeat redressability).

legal standard, remand of the case is normally appropriate for development of additional evidence pertinent to new standard). We normally pursue this course of action so that " 'the district court [may have] an opportunity to pass [judgment] on the changed circumstances,' "*Concerned Citizens of Vicksburg,* 567 F.2d at 650 (quoting *Korn,* 456 F.2d at 1208), and so that we may be aided in our appellate review by the district court's findings of fact and conclusions of law. In this case, however, we see little to be gained from further delaying this litigation so that the district court may reconsider the constitutionality of the automatic stay provision as now amended. The prisoners challenge the validity of the PLRA's automatic stay provision on its face, and as such their challenge raises purely legal issues. Consequently, because this case does not necessitate any findings of fact, the district judges' expertise in evaluating factual matters cannot advance our appellate review of this action. Rather than further delay this case by remanding to the district court, we choose to reach the merits of this case in the interest of judicial economy. *Cf. Brown & Williamson Tobacco Corp. v. FTC,* 710 F.2d 1165, 1173 & n. 3 (6th Cir.1983) (choosing to reach the merits "in the interest of judicial economy" rather than remand where the district court failed to reach the merits because it erroneously held that it lacked jurisdiction, and where the case was submitted on the law and neither side argued that further fact-finding was necessary to decide the issues presented), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 127 (1984); *Rosenstiel,* 101 F.3d at 1549–57 (reviewing constitutionality of amended campaign finance law without remanding to district court where amendment simply changed the mechanics of the expenditure limitation waiver and appellants assailed the validity of the amended law on primarily the same grounds); *Probert v. INS,* 954 F.2d 1253, 1255 (6th Cir.1992) (interpreting statute amended while on appeal).

We now turn to the constitutionality of the PLRA's automatic stay provision as amended.

## III. CONSTITUTIONALITY OF THE PLRA AUTOMATIC STAY PROVISION

Section 802 of the PLRA, 18 U.S.C. § 3626, as amended by Pub.L. No. 105–119, § 123, 111 Stat. 2440, 2470 (1997), imposes standards for the entry and termination of prospective relief in civil actions concerning conditions in prisons, designed to ensure that relief in prison reform cases would be narrowly tailored to cure actual violations of federal rights. *See* H.R.Rep. No. 104–21, 24 n.2 (1995). The Act defines "prospective relief" to include all relief, other than compensatory monetary damages, "in any form that may be granted or approved by the court, and includes consent decrees but does not include private settlement agreements." 18 U.S.C. § 3626(g)(7), (9). For prospective relief entered after the passage of the PLRA, § 802 provides for periodic review to determine whether the prescribed relief remains necessary and narrowly drawn to remedy violations of federal rights. For relief entered before the PLRA's effective date, April 26, 1996, § 802 requires that only prospective relief that comports with present legal standards should continue. *See* 18 U.S.C. § 3626(b)(2). Congress stated explicitly that § 802 of the PLRA "shall apply with respect to all prospective relief whether such relief was originally granted or approved before, on, or after the date of the enactment of this title." *See* 18 U.S.C. § 3626 note (Effective Date of 1996 Amendments). Congress also directed that the 1997 amendments to § 802 of the PLRA "shall take effect upon the date of the enactment of this Act and shall apply to pending cases." Pub.L. No. 105–119, § 123(b), 111 Stat. 2440, 2471 (1997). Congress included a severability provision that preserves the remainder of the PLRA should any portion be deemed unconstitutional. *See* 18 U.S.C. § 3626 note (Severability of Provisions).[10]

---

**10.** Thus far, courts interpreting 18 U.S.C. § 3626 since passage of the PLRA, including this court, have focused primarily on the immediate termination standards, § 3626(b)(2)-(b)(3), and not on the automatic stay, § 3626(e)(2). These cases have largely concluded that the immediate termination provisions are constitutional. *See Hadix v. Johnson,* 133 F.3d 940, 942–43 (6th Cir.1998)

(holding § 3626(b)(2)'s termination provision constitutional); *Dougan v. Singletary,* 129 F.3d 1424 (11th Cir.1997) (same); *Inmates of Suffolk County Jail v. Rouse,* 129 F.3d 649 (1st Cir.1997) (holding § 3626 constitutional); *Benjamin v. Jacobson,* 124 F.3d 162 (2nd Cir.1997) (interpreting language of the PLRA immediate termination

The filing of a motion to terminate a consent decree under the PLRA triggers an automatic stay of all prospective relief under the decree on the thirtieth day after the motion's filing, or upon the ninetieth day after the motion's filing should the court postpone the automatic stay's effective date by sixty days for good cause, pending a final ruling on the motion. *See* 18 U.S.C. § 3626(e)(2)-(3) (as amended in 1997). The parties dispute whether the statute, as amended, permits the courts to invoke their equitable authority and suspend the automatic stay.

 The prisoners and the Justice Department argue that the PLRA as amended implicitly recognizes the lower courts' discretionary power to stay the automatic stay in accordance with principles of equity. Where courts improperly exercise power they do not possess or fail to take required action, the appropriate recourse for the aggrieved party is to petition the court of appeals for a writ of mandamus, not interlocutory appellate review. *See La Buy v. Howes Leather Co.,* 352 U.S. 249, 257, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957). For example, Congress amended § 3626(e)(1) to provide for mandamus where the district court fails "to issue a prompt ruling" on a motion to terminate or modify a consent degree brought under § 3626(b), 18 U.S.C. § 3626(e)(1) (as amended in 1997), in order "to make clear that mandamus relief is available to compel the court to issue a ruling on a pending motion." H.R. CONF. REP. 105–405, at —— (1997), *reprinted in* 143 CONG. REC. H10845 (November 13, 1997). Rather than provide for a writ of mandamus to remedy "[a]ny order staying, suspending, delaying, or barring the operation of the automatic stay," other than an order postponing the automatic stay pursuant to § 3626(e)(3), Congress enacted § 3626(e)(4), which provides for interlocutory appeal of such orders pursuant to 28 U.S.C. § 1292(a)(1). *See* 18 U.S.C. § 3626(e)(4) (as amended in 1997). The prisoners and the Justice Department

logically argue that Congress would have no need to provide for expedited review of orders suspending the automatic stay if the courts did not have the power to issue such orders. In other words, had Congress intended to bar the courts from issuing orders suspending operation of the automatic stay, Congress would have explicitly stated as much and would have provided the remedy of mandamus rather than for appellate review of such orders.

Disagreeing with this interpretation, the state prison officials contend that the automatic stay provision as amended does not authorize any court to postpone the effective date of the automatic stay by more than sixty days, and that in adding § 4 Congress merely established appellate jurisdiction over district court orders suspending the automatic stay. Noting that prior to the 1997 amendment, the prisoners in this case argued on appeal that the district courts' initial orders suspending the automatic stay were not appealable interlocutory orders and that we therefore lacked jurisdiction over this appeal, the state officials suggest that Congress enacted § 4 in order to put to rest the prisoners' jurisdictional challenge.

 In resolving this conundrum as to the proper interpretation of the PLRA automatic stay provision, we rely on two rules of statutory construction. First, we will not interpret a statute as limiting the equitable jurisdiction of federal courts absent a clear command from Congress to the contrary. *See Califano v. Yamasaki,* 442 U.S. 682, 705, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979); *see also Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). Because our review of the amended statute and its accompanying legislative history fails to reveal a clear congressional intent to displace the equitable powers of the federal courts, we must construe the PLRA automatic stay provision as

provision, 18 U.S.C. § 3626(b), to avoid constitutional problems); *Gavin v. Branstad,* 122 F.3d 1081 (8th Cir.1997) (upholding constitutionality of § 3626(b)(2)-(b)(3)); *Plyler v. Moore,* 100 F.3d 365 (4th Cir.1996) (same), *cert. denied,* —— U.S. ——, 117 S.Ct. 2460, 138 L.Ed.2d 217 (1997); *Jensen v. County of Lake,* 958 F.Supp. 397 (N.D.Ind.1997) (same); *James v. Lash,* 965

F.Supp. 1190 (N.D.Ind.1997) (same); *but see Taylor v. Arizona,* 972 F.Supp. 1239 (D.Ariz. 1997) (finding § 3626(b) unconstitutional). Though the immediate termination and automatic stay provisions are connected and share similar features, we direct our inquiry in the instant appeal solely to review of the automatic stay provision.

preserving the courts' inherent power to suspend the automatic stay. Second, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the [courts] will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Concrete Pipe and Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 628–29, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (quoting *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)); *see also Lynch v. Overholser,* 369 U.S. 705, 711, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962) ("[A] statute should be interpreted, if fairly possible, in such a way as to free it from not insubstantial constitutional doubts."). For the reasons explained below, we believe the statutory construction advanced by the state prison officials constitutes an unconstitutional incursion by Congress into the powers reserved for the Judiciary, whereas the alternative construction put forward by the prisoners and the Justice Department avoids such constitutional infirmities. Because "[f]ederal statutes are to be so construed as to avoid serious doubt of their constitutionality," *International Ass'n of Machinists v. Street,* 367 U.S. 740, 749, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), we agree with the prisoners' and Justice Department's construction of the PLRA's automatic stay provision and hold that the courts retain the power to suspend the automatic stay in accordance with general equitable principles. Given this construction, the amended automatic stay provision is constitutional.

### A. Displacement of Courts' Inherent Powers

 Certain inherent powers of the courts are said to be "rooted in the notion that a federal court, sitting in equity, possesses all of the common law equity tools of a Chancery Court ... to process litigation to a just and equitable conclusion." *ITT Community Dev. Corp. v. Barton,* 569 F.2d 1351, 1359 (5th Cir.1978). Included among the courts' traditional inherent powers is the authority to issue injunctive relief, such as the power to stay court orders. This authority derives not only from the power of the Judi-

ciary to manage its affairs, *see Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (explaining that the courts' inherent powers are governed "by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases" (quotation omitted)); *cf. Clinton v. Jones,* — U.S. —, 117 S.Ct. 1636, 1650, 137 L.Ed.2d 945 (1997) (underscoring a district court's broad discretion "to stay proceedings as an incident to its power to control its own docket"), but also furthers the pursuit of achieving complete justice by enabling the court to suspend those judgments whose enforcement leads to inequitable results. *Cf. Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 233–34, 115 S.Ct. 1447, 131 L.Ed.2d 328 (explaining that Rule 60(b) "merely reflects and confirms the courts' own inherent and discretionary power, 'firmly established in English practice long before the foundation of our Republic,' to set aside a judgment whose enforcement would work inequity") (quoting *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 244, 64 S.Ct. 997, 88 L.Ed. 1250 (1944)); *Chambers,* 501 U.S. at 44, 111 S.Ct. 2123 (stating that the historic power of equity allows a federal court to vacate its own judgment where induced by fraud). Although "the exercise of the inherent power of lower federal courts can be limited by statute and rule, for [t]hese courts were created by act of Congress," *Chambers,* 501 U.S. at 47, 111 S.Ct. 2123 (quotation omitted) (alteration in original), "the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command." *Porter,* 328 U.S. at 398, 66 S.Ct. 1086; *see also Califano,* 442 U.S. at 705, 99 S.Ct. 2545 ("Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction."). We require Congress to make plain its desire to limit the courts' inherent powers because " '[t]he great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.' " *Porter,* 328 U.S. at 398, 66 S.Ct. 1086 (quotation omitted).

We do not think the language of the PLRA automatic stay provision or the statute's legislative history compels a departure from the courts' inherent power to stay judicial orders in order to achieve equity. As explained previously, the prisoners' and the Justice Department's statutory construction is based on the logical assumption that Congress would not have provided in § 3626(e)(4) for expedited review of orders suspending the automatic stay if the courts did not have the authority to issue such orders. Moreover, the legislative history does not reveal a clear congressional command limiting the courts' inherent powers. Although the Conference Report accompanying the 1997 bill amending the automatic stay provision explains that Congress wished "to make clear that mandamus relief is available to compel the court to issue a ruling on a pending motion [to terminate or modify the consent decree] and to provide the courts additional time (60 days) to rule on motions to terminate before the automatic stay takes effect," the report is silent as to the legislative intent behind § 4. *See* H.R. CONF. REP. No. 105–405 (1997). Nor does the report indicate whether Congress sought to eliminate all judicial discretion over the operation of the automatic stay.[11] Accordingly, we must resolve the ambiguities surrounding the automatic stay provision in favor of the interpretation which preserves the courts' ability to consider proceedings brought under the PLRA termination provisions in accordance with traditional equitable practices. *Cf. Hecht Co. v. Bowles,* 321 U.S. 321, 330, 64 S.Ct. 587, 88 L.Ed. 754 (1944) (resolving the ambiguities of § 205(a) of the Emergency Price Control Act of 1942, 50 U.S.C.App. § 925(a) (1944), "in favor of that interpretation which affords a full opportunity for equity courts to treat enforcement proceedings under this emergency legislation in accor-

dance with their traditional practices"). We therefore accept the statutory construction advanced by the prisoners and the Department of Justice.

## B. Constitutional Considerations: Separation–of–Powers Doctrine

We are committed to interpreting the PLRA automatic stay provision not only as preserving the courts' inherent powers absent clear congressional command to the contrary, but also in a manner that renders the statute constitutionally valid. *See Communications Workers of Am. v. Beck,* 487 U.S. 735, 762, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988); *see also Robertson v. Seattle Audubon Soc'y,* 503 U.S. 429, 441, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992). We thus must confront the fundamental question of whether the state prison officials' construction of the statute raises serious constitutional problems, specifically, under that view whether the statute constitutes an unconstitutional incursion by Congress into powers reserved to the Judiciary. We conclude that the state officials' construction of the PLRA automatic stay provision violates the separation-of-powers doctrine. Because the prisoners' and the Justice Department's construction of the provision avoids the serious constitutional problems posed by the state officials' statutory construction, it is incumbent upon us to interpret the PLRA automatic stay provision as preserving the court's inherent authority to suspend the automatic stay in accordance with general equitable principles.

■ The constitutionality of a statute is a question of law, reviewable de novo. *See United States v. Brown,* 25 F.3d 307, 308 (6th Cir.1994), *cert. denied,* 513 U.S. 1045, 115

---

**11.** Although the Conference Report accompanying the 1997 bill amending the automatic stay provision does not reveal a clear congressional intent to displace the federal courts' inherent equitable authority, the comments of Senator Spencer Abraham support the state officials' construction of the provision. Speaking on the floor of the Senate, Senator Abraham explained the purpose of the 1997 amendments as follows:

The Department of Justice ... has contended that the stay is not really automatic at all.... The amendments ... clarify that the stay is in fact is automatic by expressly modeling it on

the bankruptcy automatic stay, and they state explicitly that any order blocking the automatic stay is appealable, thereby ensuring review of the district court's action.

143 CONG. REC. S12269 (November 9, 1997). Although Senator Abraham's statements indicate his view that Congress sought to confine the courts' discretionary power to suspend the automatic stay to the conditions explicitly stipulated in § 3626(e)(3) (as amended in 1997), we hesitate to find a clear congressional intent to curb traditional equity practice on the basis of only one congressional member's statements.

S.Ct. 640, 130 L.Ed.2d 546 (1994). Our analysis begins with a general presumption favoring the constitutionality of an act of Congress. *See Rostker v. Goldberg,* 453 U.S. 57, 64, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981); *United States v. Five Gambling Devices,* 346 U.S. 441, 449, 74 S.Ct. 190, 98 L.Ed. 179 (1953); *Fairbank v. United States,* 181 U.S. 283, 21 S.Ct. 648, 45 L.Ed. 862 (1901). Bearing this presumption in mind, we turn to the challenges to the constitutionality of the automatic stay provision of the PLRA as construed by the state prison officials.

### 1. State Officials' Interpretation— Displacement of Courts' Equitable Powers

Under the state officials' construction of the PLRA automatic stay provision, the federal courts do not retain the authority in equity to suspend the automatic stay beyond sixty days as provided in § 3626(e)(3). The prisoners argue that 18 U.S.C. § 3626(e)(2), as amended, violates the separation-ofpowers doctrine by unconstitutionally prescribing a rule of decision without changing the underlying substantive law. *See United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871).[12] Prior to the enactment of the 1997 amendments, the Department of Justice identified two other aspects of the operation of the automatic stay which affect the balance of power between the Legislature and the Judiciary—that the PLRA automatic stay directly suspends existing court orders, and places mandatory time restrictions on judicial decisionmaking which preclude the effective functioning of the Judiciary. The amendment of the PLRA automatic stay provision to permit the courts to postpone the effective date of the automatic stay for up to sixty days does not dispel these concerns.

Although we do not believe that the state officials' construction of § 3626(e)(2), as amended, prescribes a rule of decision, we conclude that under the state officials' interpretation the automatic stay provision violates the separation-of-powers doctrine because it amounts to a direct legislative suspension of a judicial order. Alternatively, under certain circumstances, the automatic stay as construed by the state officials impermissibly intrudes into the effective functioning of the Judiciary. We therefore conclude that the automatic stay as interpreted by the state officials results in an unconstitutional incursion by Congress into the powers reserved for the Judiciary, and we decline to adopt that interpretation of the automatic stay provision.

### a. Prescribing a Rule of Decision:

The inmates insist that through the PLRA's automatic stay provision, as construed by the state officials, Congress prescribed a rule of decision in a pending judicial case without changing the underlying law in contravention of *United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871). In *Klein,* the Supreme Court held that legislation dictating that acceptance of a presidential pardon constituted conclusive evidence of a person's disloyalty to the United States and directing the Court to dismiss actions pending on appeal in which property had been recovered based on a pardon was impermissibly "founded solely on the application of a rule of decision, in causes pending, prescribed by Congress." *Id.* at 146. Although Congress remains free to amend governing law and thereby affect the outcome of pending cases, *see Robertson v. Seattle Audubon Soc'y,* 503 U.S. 429, 438, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992) (upholding statute against

---

**12.** Prior to the enactment of the ·1997 amendments, the prisoners argued 18 U.S.C. § 3626(e)(2) (1996) violated the separation-of-powers doctrine not only by prescribing a rule of decision without changing the underlying substantive law, but also by directing the reopening of final judgments of courts. *See Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). Critical to this argument is the issue of whether the consent decrees constitute final judgments not subject to legislative alteration for separation-ofpowers purposes.

We recently addressed this issue in *Hadix v. Johnson,* 133 F.3d 940 (6th Cir.1998), in the context of a challenge to the constitutionality of the PLRA's termination provisions, 18 U.S.C. § 3626(b)(2)-(3). In *Hadix,* we agreed with other circuits holding that the consent decrees consist of ongoing prospective relief that is not final for separation-of-powers purposes. *See Hadix,* 133 F.3d at 942–43. Accordingly, the prisoners are foreclosed from challenging the automatic stay provision on the grounds that it unconstitutionally reopens a final judgment.

separation-of-powers challenge where new statute "compelled changes in law, not findings or results under old law"), the Legislature may not impose a rule of decision for pending judicial cases without changing the applicable law. Ultimately, the Judiciary must remain free to "say what the law is" in any given case or controversy. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).

By contrast, the PLRA automatic stay provision does not mandate a rule of decision. The automatic stay will not take effect if the court within the prescribed time period finds that the relief is no greater than that necessary to correct a current or ongoing violation of a federal right. 18 U.S.C. § 3626(e)(2)-(3) (as amended in 1997). Although Congress has specified that certain timely findings are necessary to override the stay, the legislation does not direct any particular evidentiary findings nor dictate a result in a specific case. Courts are not restrained from giving "the effect to evidence which, in its own judgment, such evidence should have." *Klein,* 80 U.S. (13 Wall.) at 147. Aside from its self-executing feature and its stringent time constraints, the interpretation and application of law to fact and the ultimate resolution of prison conditions cases at all times remains with the Judiciary. *See Gavin,* 122 F.3d at 1089 ("The PLRA leaves the judging to judges."); *cf. Hadix v. Johnson,* 133 F.3d 940, 943 (6th Cir.1998) ("[T]he termination provision ... does not dictate the result a court must reach in determining whether relief is warranted. The interpretation and application of law to fact and the ultimate resolution of prison condition cases remain at all times with the judiciary.") The PLRA automatic stay therefore technically withstands a separation-of-powers challenge based on *Klein.*

**b. Direct Legislative Suspension of Court Order:**

That the automatic stay provision does not manifestly prescribe a rule of decision in a pending case does not end our separation-of-powers inquiry. We also must closely examine the operation of the automatic stay provision, as construed by the state officials, in terms of the respective roles of Congress and the Judiciary in the suspension of existing court orders. We conclude that under the state officials' statutory construction the automatic stay provision is tantamount to direct legislative suspension of an existing court order, and we decline to embrace the state officials' construction of the statute because of this constitutional infirmity.

As has often been expressed, "the central judgment of the Framers of the Constitution [was] that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." *Mistretta v. United States,* 488 U.S. 361, 380, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The Framers intended that, as nearly as possible, each branch of government should confine itself to its assigned powers, and "that the powers properly belonging to one of the departments ought not to be *directly* and completely administered by either of the other departments," THE FEDERALIST No. 48, at 146 (James Madison) (Roy Fairfield 2d ed., 1981) (emphasis added); *see also INS v. Chadha,* 462 U.S. 919, 951, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Thus, "each of the three general departments of government [must remain] entirely free from the control or coercive influence, direct or indirect, of either of the others." *Humphrey's Executor v. United States,* 295 U.S. 602, 629, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) (quoted in *Mistretta,* 488 U.S. at 380, 109 S.Ct. 647) (alteration in *Mistretta* ). Actions of one branch which undertake directly a role reserved exclusively to another branch disrupt this constitutional balance of power.

The constitutional principle drawn from *Hayburn's Case,* 2 Dall. 409 (1792), as articulated in *Plaut,* is "that Congress cannot vest review of the decisions of Article III courts in officials of the Executive Branch." *Plaut,* 514 U.S. at 218, 115 S.Ct. 1447. We make no impermissible leap to suggest that this principle carries weight as well in a legislative suspension of a judicial order. Review of decisions of Article III courts, whether final judgments or orders implementing consent decrees, must be confined within the judicial branch. Because the suspension of a judicial order is a judicial act not to be undertaken directly by the Legislature, the Judiciary must play some role in the suspension of its

own orders. Automatic legislative suspension of existing and presumptively valid judicial decrees violates this principle.

The PLRA automatic stay provision, as construed by the state officials, runs afoul of the separation of constitutional powers because it makes the stay self-executing, taking effect without judicial action.[13] Under the state officials' interpretation, courts may not postpone the effective date of the stay beyond sixty days, and the sixty-day extension is limited to situations involving good cause (not including "general congestion of the court's calendar"). *See* 18 U.S.C. § 3626(e)(3) (as amended in 1997). Should the court fail to enter a final order ruling on the motion to modify or terminate prospective relief before the expiration of the sixty-day postponement, the automatic stay takes effect without judicial action. 18 U.S.C. § 3626(e)(2) (as amended in 1997). Thus, under the state officials' statutory construction, even if the court postpones the effective date of the automatic stay by the full sixty days allowed, on the ninety-first day after filing its motion, the state officials could simply refuse to comply with existing court orders implementing the consent decrees because the state could claim that pursuant to a congressional mandate those orders "automatically" have no force. Thus, if we applied the statute in the manner urged by the state officials, the "practical consequences" of the PLRA automatic stay would result, quite simply, in a temporary legislative veto over court-ordered relief in an ongoing case before the court. Such direct legislative suspension of orders of Article III courts simply cannot be harmonized with our tripartite system of governance.

It is of course true that at any time Congress can alter the outcome of pending cases, or those involving ongoing supervisory court jurisdiction, by changing the substantive law that courts use in rendering decisions. *Cf. Plaut*, 514 U.S. at 226, 115 S.Ct. 1447 ("Congress can always revise the judgments of Article III courts in one sense: When a new law makes clear that it is retroactive" and thus is applied in pending cases). When that

happens, however, the new law must still be applied in the particular case. The litigating parties are not entitled to act simply on Congress's command; they must go back to the court that issued the order to have the new law applied to their situation. Were Congress able to stay judicial orders directly, then any party subjected to a continuing court order might be able to bypass the issuing and reviewing courts entirely. The PLRA automatic stay, as construed by the state prison officials, impermissibly circumvents the judicial process.

■ The defendants argue that legislative authority to enact an automatic stay of judicial proceedings has long been established, as evidenced by the time-honored automatic stay in the bankruptcy arena. Upon the filing of a bankruptcy petition, § 362(a) of Title 11 requires a stay of civil litigation against a debtor unless the bankruptcy court determines otherwise. In upholding the constitutionality of this bankruptcy automatic stay, the Supreme Court explained that although "[i]t is generally true that a judgment by a court of competent jurisdiction bears a presumption of regularity and is not thereafter subject to collateral attack," Congress, pursuant to its plenary constitutional power over bankruptcy, *see* U.S. CONST. art. I, § 8, cl. 4, "may by specific bankruptcy legislation create an exception to that principle and render judicial acts taken with respect to the person or property of a debtor whom the bankruptcy law protects nullities and vulnerable collaterally." *Kalb v. Feuerstein*, 308 U.S. 433, 438–39, 60 S.Ct. 343, 84 L.Ed. 370 (1940) (footnotes omitted). Thus, under the exclusive constitutional grant of power to Congress to regulate bankruptcy, "Congress can limit the jurisdiction which courts, State or Federal, can exercise over the person and property of a debtor who duly invokes the bankruptcy law." *Id.* at 439, 60 S.Ct. 343. In contrast, once Congress establishes jurisdiction of the lower federal courts in an area outside Congress's enumerated Article I plenary powers, "the courts are vested with judicial powers pursuant to Article III."

**13.** *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 148 (1986) (defining "automatic" as "having a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation"); RANDOM HOUSE UNABRIDGED DICTIONARY 140 (2d ed.1993) (defining "automatic" as "having the capability of starting, operating, moving, etc., independently").

*Eash v. Riggins Trucking Inc.,* 757 F.2d 557, 562 (3d Cir.1985) (en banc). Having conferred jurisdiction upon the lower courts in this area, the Legislature cannot then displace the courts and itself exercise judicial power, save through impeachment. *See* Gary Lawson & Christopher D. Moore, *The Executive Power of Constitutional Interpretation,* 81 IOWA L.REV. 1267, 1317 (1996) ("[N]o decision of any court of the United States can, under any circumstances ... agreeable to the constitution, be liable to a revision, or even suspension, by the legislature itself, in whom no judicial power of any kind appears to be vested, but the important one relative to impeachments."). As articulated by Madison, "[t]he entire legislature can perform no judiciary act," and "[w]ere the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would then be *the legislator.*" THE FEDERALIST No. 47, at 141 (James Madison) (Roy Fairfield 2d ed., 1981) (quoting Montesquieu).

Our analysis convinces us that were we to interpret the PLRA's automatic stay provision as automatically suspending judicial orders without allowing for the exercise of the courts' equitable authority to stay the automatic stay, the PLRA automatic stay provision would be constitutionally deficient and could not stand.[14]

**c. Encroachment into the Functioning of the Judiciary:**

█ The state officials argue that the PLRA automatic stay, as they have construed it, amounts to no more than a legislative enactment in keeping with Congress's constitutional authority to control the jurisdiction of the federal courts. The express language of our Constitution confers in Congress the power to constitute inferior federal courts in which may be vested some or all of the judicial power of the United States. *See* U.S. CONST. art. I, § 8, cl. 9; U.S. CONST. art. III, § 1. Nevertheless, having granted the courts jurisdiction to entertain a particu-

lar case or controversy, Congress cannot then diminish the power of the courts to an extent which renders the courts unable to meet their obligation of providing adequate remedies. *See Benjamin,* 124 F.3d at 170; *see also* Theodore Eisenberg, *Congressional Authority to Restrict Lower Federal Court Jurisdiction,* 83 YALE L.J. 498, 527 (1974) ("Congress ... may enact any jurisdictional statute that does not prevent vindication of a constitutional right."). We must therefore carefully consider whether in enacting the PLRA's automatic stay provision, 18 U.S.C. § 3626(e)(2), the Legislature impermissibly conditioned the exercise of judicial power so as to render it ineffective.

█ To achieve separate yet balanced power among the branches, certain inherent powers issue by necessity to each of the three branches:

> [I]f there is one maxim which necessarily rides over all others, in the practical application of government, it is, that the public functionaries must be left at liberty to exercise the powers which the people have intrusted to them. The interests and dignity of those who created them, require the exertion of the powers indispensable to the attainment of the ends of their creation.

*Anderson v. Dunn,* 19 U.S. (6 Wheat.) 204, 226, 5 L.Ed. 242 (1821). Recognizing this maxim, the Supreme Court has cautioned that the constitutional structure requires "that the independence of the Judiciary be jealously guarded." *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 60, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982); *see also* THE FEDERALIST No. 78, at 228 (Alexander Hamilton) (Roy P. Fairfield 2d ed., 1981) ("The complete independence of the courts of justice is peculiarly essential in a limited Constitution."). Thus, we will only uphold a statute challenged as an impermissible legislative incursion into the workings of the judicial branch where it cannot "be construed as preventing the judicial branch 'from accomplishing its constitutionally as-

---

**14.** We note in passing that Congress did not restrict the PLRA automatic stay to operation solely in the federal courts, as it did with the special masters procedural provision in 18 U.S.C. § 3626(f). Section 3626 applies to civil proceedings initiated in federal or state court arising under federal law with respect to prison conditions. *See* 18 U.S.C. § 3626(g)(2). Because the cases we review were brought in federal court, we do not address possible effects of the legislative mandate upon state court processes.

signed functions.'" *Mistretta,* 488 U.S. at 396, 109 S.Ct. 647 (quoting *Nixon v. Administrator of General Servs.,* 433 U.S. 425, 443, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977)). A statutory scheme that poses a serious danger of encroachment or threatens the ability of the Judiciary to carry out its constitutional duties, however, so impinges upon the autonomy of the Judiciary as to run afoul of the separation-of-powers doctrine. *Cf.* Dean Alfange, Jr., *The Supreme Court and the Separation of Powers: A Welcome Return to Normalcy?,* 58 GEO. WASH. L.REV. 668, 712 (1990) ("The measure of the constitutionality of a government action challenged as violating the principle of separation of powers ... [is whether] it so hamstring[s] the ability of any of the branches independently to exercise its powers or to perform its functions that it is prevented from effectively carrying out its constitutional responsibilities....").

It is beyond dispute that there are certain inherent powers of the Judiciary that are untouchable by legislative act, *see United States v. Hudson & Goodwin,* 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812) ("Certain implied powers must necessarily result to our Courts of justice from the nature of their institution."); *see also Eash v. Riggins Trucking Inc.,* 757 F.2d 557, 561 (3d Cir. 1985) (en banc) ("That courts have inherent powers—powers vested in the courts upon their creation, and not derived from any statute—is not disputed." (citations omitted)). Although the exact boundaries of the courts' inherent powers thus far has eluded complete categorization, at a minimum those boundaries encompass "activity so fundamental to the essence of a court as a constitutional tribunal that to divest the court of absolute command within this sphere is really to render practically meaningless the terms 'court' and 'judicial power.'" *Eash,* 757 F.2d at 562. Because the denial of these fundamental

powers renders courts practically inoperative, courts must be allowed to exercise those inherent powers essential to their constitutionally assigned role notwithstanding contrary legislative direction. *Id.*

The Judiciary's fulfillment of its Article III responsibilities requires, at its core, meaningful judicial decisionmaking. *See United States v. Rojas,* 53 F.3d 1212, 1214 (11th Cir.) ("[S]eparation of powers would be implicated when the actions of another Branch threaten an Article III court's independence and impartiality in the execution of its decisionmaking function."), *cert. denied,* 516 U.S. 976, 116 S.Ct. 478, 133 L.Ed.2d 407 (1995). The preservation of this inherent power, so fundamental to the bestowal of evenhanded justice, requires that all federal courts be permitted to analyze relevant facts and the applicable substantive law untethered by the legislative branch. Otherwise, were the Legislature permitted to tie the deliberative hands of the Judiciary by erecting procedural hurdles that render thorough and thoughtful deliberation an impossibility, the will of the majority could effectively take control of the judicial process by sufficiently elevating the procedural hurdles in select areas of especially unpopular litigation. *See* J. Richard Doidge, Note, *Is Purely Retroactive Legislation Limited by the Separation Powers?: Rethinking* United States v. Klein, 79 CORNELL L. REV. 910, 924 (1994) ("The legislature cannot do indirectly that which it cannot do directly."). Moreover, unconstrained deliberation by the Judiciary not only is necessary to preserve the independence of the Judiciary but also to protect due process rights of individual parties who come before the courts. Accordingly, Congress cannot restrict the independent and unconstrained judicial decisionmaking of the courts any more than it can directly stay the judicial order itself.[15]

---

**15.** We do not quarrel with Congress's unquestioned authority, which is routinely exercised, to prescribe procedural requirements that regulate federal court practice. Descending from the earliest days of the federal judiciary, it is by now beyond contention that "Congress has undoubted power to regulate the practice and procedure of federal courts," *Sibbach v. Wilson & Co.,* 312 U.S. 1, 9, 61 S.Ct. 422, 85 L.Ed. 479 (1941), and such rules "bind judges and courts in the proper management of the cases before them." *Mistretta,* 488 U.S. at 391. *See also Hanna v. Plumer,*

380 U.S. 460, 472, 473, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). Apart from time restrictions on the parties, however, temporal strictures upon actual judicial decisionmaking are scarce. *See* Speedy Trial Act of 1974 § 101, Pub.L. No. 93-619, 88 Stat.2076 (codified as amended at 18 U.S.C. § 3161 (setting forth time limits in criminal trials for both pre-trial and trial procedures)). Rarely do such rules and statutes intrude upon the Judiciary's substantive decisional role; where a judicial decision is tied to a temporal

■■■■ We fear that in many prisoner cases, the application of the PLRA automatic stay, as construed by the state officials, implicates the integrity and fairness of judicial decisionmaking by substantially impeding the courts' capability for thorough and thoughtful consideration. As interpreted by the state officials, the PLRA automatic stay requires nondiscretionary suspension of court-ordered prospective relief thirty days following the filing of a termination motion, or ninety days following the filing of the termination motion should the court postpone the effective date of the automatic stay by sixty days for good cause. This grace period is the only qualification on the otherwise compulsory suspension; beyond this grace period, under the state's view courts retain no discretion to defer the operation of, or dissolve, the automatic stay. In many cases, including those now before us on this appeal, the district courts' statutory task of ascertaining the presence of a current or ongoing violation of a federal right requires delving into complex factual or legal intricacies and a court record spanning many years. *See, e.g., Hadix I*, 933 F.Supp. at 1361; *Hadix II*, 933 F.Supp. at 1364. Consequently, thirty or ninety days before onset of the automatic stay may prove an inadequate period of time in which to find

a constitutional violation where one has never before been explicitly recognized. By not allowing for judicial discretion in those cases where a court simply cannot exercise meaningful review within the prescribed time period, the PLRA automatic stay, as construed by the state officials, impedes the courts' substantive decisional role and can result in deleterious and distorting effects upon the outcome of the legal determination. Accordingly, in cases where the provision's deadline proves impossible to meet, if we were limited to the state officials' interpretation we would be obligated to declare that the automatic stay provision's time restriction unconstitutionally denigrates the Judiciary's status as a coequal branch in violation of the separation-of-powers doctrine.[16]

### 2. Prisoners' and Justice Department's Interpretation—Preservation of Courts' Equitable Powers

Disagreeing with the state officials' reading of the PLRA automatic stay provision, the prisoners and the Justice Department argue that by its terms the provision implicitly recognizes the courts' inherent power to invoke the injunctive process in order to do equity. As we explained previously, this con-

---

stricture, the court usually retains discretion to override the restriction for good cause. *See* Fed. R.Civ.P. 60(b), 65; Speedy Trial Act § 101(h), 18 U.S.C. § 3161(h) (ends of justice); *see also United States v. Brainer*, 691 F.2d 691, 696 (4th Cir.1982) (dismissing notion that statutes of limitations or Speedy Trial Act sanctions infringe the court's substantive role). It is one thing for Congress to prescribe procedures to be followed in federal court; conferring jurisdiction and then directing that judicial deliberation be exercised in an unduly restrictive manner is quite a different matter.

**16.** The inmates also argue that the PLRA's automatic stay provision, as construed by the state officials, deprives them of their entitlement to relief that has vested by a court judgment in violation of their due process rights. Under the "vested-rights" doctrine, Congress lacks the power to abridge constitutionally-protected property interests that have vested through a final judgment of law. *McCullough v. Virginia*, 172 U.S. 102, 123–24, 19 S.Ct. 134, 43 L.Ed. 382 (1898). The inmates, however, do not have vested rights in the prospective relief afforded under these consent decrees. *See Hadix v. Johnson*, 133 F.3d 940, 943 n. 3 (6th Cir.1998). While consent decrees in certain respects resemble contracts, they are fundamentally judicial acts that have

never been held to be beyond a court's power to modify as equity requires. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) (recognizing contractual aspects of consent decrees but holding them "subject to the rules generally applicable to other judgments and decrees."). To the extent that the decrees and their implementing orders remain subject to modification and continuous court supervision, they cannot confer protected property interests for due process purposes. *See System Fed'n No. 91, Ry. Employees' Dep't v. Wright*, 364 U.S. 642, 649–52, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961) (the plaintiffs had no vested right to have a consent decree enforced after Congress altered the decree's enabling statute since "the parties have no power to require of the court continuing enforcement of rights the [enabling] statute no longer gives"). Accordingly, the prospective relief under a consent decree is not a final judgment for purposes of the vested-rights doctrine. *See Benjamin v. Jacobson*, 124 F.3d 162, 176 (2d Cir.1997); *Gavin v. Branstad*, 122 F.3d 1081, 1090–92 (8th Cir.1997); *Plyler v. Moore*, 100 F.3d 365, 374 (4th Cir.1996). Thus the PLRA automatic stay does not dispossess or trammel upon judicially-vested rights.

struction of the automatic stay provision is reasonable and not contrary to clear legislative intent. In order to assess whether the prisoners' and the Justice Department's construction of the automatic stay provision avoids the serious constitutional problems posed by the state officials' statutory construction, we must first identify the contours of the equitable powers retained by the courts.

■ Because the lower courts are created by Congress, a lower court's equitable powers are "conditioned by the necessities of the public interest which Congress has sought to protect" in enacting the statute governing the case before the court. *Hecht Co.*, 321 U.S. at 330, 64 S.Ct. 587. We therefore begin our analysis with the policy objectives underlying the PLRA. Concern that the life of consent decrees in prisoner litigation cases often extended beyond the time necessary to correct violations of the prisoners' federal rights, Congress sought to terminate judicial supervision of prisons where the necessity for that supervision no longer exists. *See* H.R. REP. NO. 104–21, at 24 n.2 (1995). To this end, Congress provided for review of all prospective relief and commanded that the federal courts terminate such relief absent proof of an ongoing violation of the prisoners' federal rights. 18 U.S.C. § 3626(b)(2). In an effort to encourage speedy resolution of motions brought under the PLRA termination provisions, Congress enacted the automatic stay provisions because it believed that "[b]y providing that the prospective relief that is subject to the motion will be stayed if the motion is not decided promptly, judges will be motivated to decide the motions and avoid having the stay automatically take effect." H.R. REP. NO. 104–21, at 26 (1995). At the same time, Congress did not seek to limit the courts' authority to grant or approve relief where prisoners "can prove a violation of [their] federal rights." *Id.* at 23.

■ Deference to Congress's intent of restricting prospective relief to only those prisoner cases where such relief is necessary to correct a proven violation of a federal right requires that courts invoke their equitable authority to suspend the automatic stay in very limited circumstances. Were district courts routinely to exercise their inherent power to suspend the automatic stay, the very tool Congress utilized in an effort to encourage expeditious review of motions to terminate prospective relief in prisoner reform cases would be rendered useless. Moreover, "[b]ecause of their very potency," the inherent powers of the courts "must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44, 111 S.Ct. 2123. At the same time, the lower courts' authority must remain flexible enough so that they may fulfill the guiding principle of equity— "securing complete justice." *Porter*, 328 U.S. at 398, 66 S.Ct. 1086 (quotation omitted).

■ We are satisfied that the traditional standard governing the issuance of a preliminary injunction in equity properly balances these considerations, although we do not rule out the possibility that a lower court may justifiably suspend the operation of an automatic stay under other equitable standards.[17] The determination of whether to grant a preliminary injunction involves balancing the following factors:

> (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction.

*Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir.1994); *see also International Resources, Inc. v. New York Life Ins. Co.*, 950 F.2d 294,

---

**17.** The Department of Justice suggests that the lower courts may issue an order staying the PLRA's automatic stay where requiring plaintiffs to make a preliminary showing on the merits would be inequitable due to circumstances beyond plaintiffs' control which impair their ability to present adequately their position to the court. Supplemental Br. for the U.S. at 10–11, 15–16. While this position strikes us as reasonable, we believe it premature at this juncture to rule definitively on this matter without the benefit of briefing from all parties in a case that by its factual posture squarely presents the issue to the court.

302 (6th Cir.1991), *cert. denied,* 504 U.S. 973, 112 S.Ct. 2941, 119 L.Ed.2d 565 (1992). Because these factors are not prerequisites but must be balanced, the likelihood of success required to support a suspension of the automatic stay depends on the strength of the other factors considered. *See Washington,* 35 F.3d at 1099.

While we do not attempt here to identify all scenarios in which the district court may appropriately suspend the automatic stay, we pause to note the fundamental importance of the courts' ability to provide meaningful review. As explained previously, where Congress impedes the Judiciary's capacity for thorough and thoughtful consideration so as to undermine inevitably the integrity and fairness of judicial decisionmaking, the constitutional principle of separation-of-powers is severely compromised. In those complex cases where the district court simply cannot exercise meaningful review before the effective date of the automatic stay, the public interest in protecting the courts' deliberative role militates in favor of suspending the automatic stay. We emphasize that although courts often may find it difficult to provide meaningful review, constitutional concerns about an unwarranted incursion by Congress into the province retained for the Judiciary arise only where thorough and thoughtful judicial decisionmaking is virtually impossible. Where a district court retains the ability, however difficult, to probe relevant factual and legal issues and deliberate upon matters before the court, it is in a position to protect its judicial orders against direct legislative suspension and to fulfill its "obligation to exercise its jurisdiction meaningfully," *United States v. Michigan,* 18 F.3d 348, 352 (6th Cir.), *cert. denied,* 513 U.S. 925, 115 S.Ct. 312, 130 L.Ed.2d 275 (1994).

By preserving the federal courts' ability to suspend the automatic stay where necessary to ensure meaningful review and to protect judicial orders against direct legislative suspension, the prisoners' and Justice Department's construction of the PLRA automatic stay provision avoids the constitutional infirmities which plague the state officials' construction. Our commitment to construing federal statutes not only to preserve the federal courts' inherent powers but also to avoid where fairly possible serious doubt as to their constitutionality necessitates our rejecting the state officials' construction of the automatic stay provision in favor of the prisoners' and Justice Department's construction. Accordingly, we hold that the § 3626(e), as amended, does not interfere with the traditional inherent powers of the courts and therefore as so interpreted does not give rise to an unconstitutional incursion by Congress into the powers reserved for the Judiciary. Because the time period prescribed by the automatic stay provision long ago expired in the cases before us, on remand the district courts should consider whether to exercise their inherent equitable powers to suspend the automatic stay in conformity with this opinion, to allow the automatic stay to take effect, or to terminate the decrees.

## IV. RETROACTIVITY OF ATTORNEY FEES PROVISION

▇▇ We now turn to the award of attorney fees entered in the *Hadix* litigation by Judge Feikens on May 30, 1996. *See* J.A. # 96–1851 at 464–69. What would have amounted to a rather commonplace judicial ruling on disputed attorney hours in an ongoing litigation has been complicated by its unfortunate timing. The inmates' entitlement to attorney monitoring fees and procedures for payment was established in the *Hadix* litigation in 1987. *See* J.A. # 96–1851 at 165–66. Pursuant to prescribed procedure, in early 1996 the inmates submitted to the state officials petitions for attorney fees covering the period of July through December 1995. The state officials objected to certain hours, and the parties could not resolve the dispute by themselves. The inmates therefore filed a motion for attorney fees with the court on March 12, 1996. J.A. # 96–1851 at 277–78. The motion, entirely for fees incurred in the latter half of 1995, was pending before the district judge on April 26, 1996, when the PLRA took effect.

Section 803(d) of the PLRA amended the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, et seq., as it applied to awards of attorney fees. Prior to the passage of the PLRA, courts were authorized under 42 U.S.C. § 1988 to award attor-

ney fees in this type of prison reform litigation based on the community's market rate for the services rendered. *See Hadix v. Johnson,* 65 F.3d 532, 536 (6th Cir.1995); *Missouri v. Jenkins,* 491 U.S. 274, 283, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989). Section 803(d) of the PLRA, however, limits attorney fees authorized in prison litigation to an amount "directly and reasonably incurred in proving an actual violation of the plaintiff's rights" and proportional to or directly and reasonably incurred in enforcing the court-ordered relief. *See* 42 U.S.C. § 1997e(d).[18] In addition, the rate upon which the award is based may not exceed 150 percent of the hourly rate established under 18 U.S.C. § 3006A.[19] The 1995 established rate of pay in the *Hadix* litigation was $150 per hour. *See* J.A. # 96–1851 at 174, 392. Though the parties do not agree on how the PLRA would affect the rate of pay in this case, we assume, for illustrative purposes only, that the PLRA would cap the maximum hourly rate for attorney fees in this case at $112.50 (150% of $75 maximum hourly rate).[20] *See* 42 U.S.C. § 1997e(d)(3).

Seeking to take advantage of the lesser rate and more stringent standard, the state officials asked the district court to apply the PLRA's attorney fees provisions to the pending motion, arguing that the PLRA applies to all "awards" entered after the enactment date, April 26, 1996, regardless of when the fees were actually earned. Upon consideration, the district court denied application of the PLRA to the fees earned in 1995 and directed payment at the pre-established rate

of $150 per hour. J.A. # 96–1851 at 464–69. Before us the state officials renew their arguments and ask us to hold that the PLRA's new attorney fees limitations apply to legal work completed prior to the passage of the PLRA. We decline their invitation.

We recently addressed the retroactivity of the PLRA's attorney fee provisions to legal work performed before its enactment, and held "that allowing the PLRA's limitations on attorney fees to alter the standards and rate for awarding fees for legal work competed prior to passage of the PLRA results in an impermissible retroactive effect by attaching significant new legal burdens to the completed work, and by impairing rights acquired under preexisting law." *Glover v. Johnson,* 138 F.3d 229, 250 (6th Cir.1998). Accordingly, we hold that the award of attorney fees for legal work performed prior to the enactment of the PLRA is governed by 42 U.S.C. § 1988, and not § 803(d) of the PLRA.

As for the propriety of any given fee award, provided the district court explains its reasoning in a clear and concise manner, an award of attorney fees under 42 U.S.C. § 1988 "is entitled to substantial deference." *Hadix,* 65 F.3d at 534–35; *see also Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). "Accordingly, we review a district court's award of attorney fees, including the fee rate, only for abuse of discretion." *Hadix,* 65 F.3d at 534. The state officials assert that some of the hours to prepare an appellate brief were excessive, duplicative, and thus unreasonable.[21] The contested brief was prepared for

---

**18.** Section 1997e of Title 42, as amended by the PLRA, provides in relevant part:

 (d) **Attorney's Fees**

 (1) In any action brought by a prisoner ... in which attorney's fees are authorized under [42 U.S.C. § 1988], such fees shall not be awarded, except to the extent that—

 (A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under [42 U.S.C. § 1988]; and

 (B)(i) the amount of the fee is proportionately related to the court ordered relief for the violation; or

 (ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.

**19.** Section 1997e of Title 42, as amended by the PLRA, provides in relevant part:

 (d) **Attorney's Fees** ...

 (3) No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under [18 U.S.C. § 3006A], for payment of court-appointed counsel.

**20.** As we hold the PLRA's attorney fees provisions inapplicable to the fee award underlying this appeal, we have no occasion to resolve what would be the hourly rate in this case under the PLRA.

**21.** On appeal the state officials object to 100 hours for Deborah LaBelle and 17.4 hours for Michael Barnhart. *See* J.A. # 96–1851 at 287–304 for itemization of hours.

an appeal to this court of a district court order refusing to modify the out-of-cell activity plan and mandating college programming following *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). Judge Feikens, who was intimately aware of the work being performed by the attorneys, of the prior history of the case, and of the need to revisit the modification request following *Rufo,* found the hours at issue to be reasonable for the composition of a complex appellate brief. *See* J.A. # 96–1851 at 464–69 (Op. and Order Regarding Pls.' Mot. for Att'y Fees). Our primary concern is that the fee awarded was reasonable, and we are satisfied that it was. *See Hadix,* 65 F.3d at 535; *cf. Northcross v. Board of Educ. of Memphis City Schs.,* 611 F.2d 624, 640–42 (6th Cir.1979) (discussing reasonableness of attorney fees award for large school desegregation case), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980). Not having been persuaded that the district court's reasonableness finding was erroneous, we affirm the district court's May 30, 1996 order awarding attorney fees.

## V. OTHER ISSUES

### A. Termination of Security Classification

■ As part of the *USA* decree, the state officials agreed to design and implement a plan to classify prisoners' risks and security levels for the various facilities. Through his July 3, 1996 opinion, Judge Enslen refused to terminate federal court jurisdiction over the security classification system at the Michigan Reformatory, one of the five correctional facilities subject to the *USA* decree. That decision is now before us.

In April 1992, the parties to the *USA* decree filed a joint motion to dismiss most components of the decree and simultaneously asked the court to modify the *USA* decree's termination clause so that termination would occur as to any consent decree provision in isolation when the defendants are in compliance with constitutional requirements. The

district court accepted the piecemeal termination proposal, but refused to allow termination solely upon compliance with constitutional requirements; rather, termination would depend upon compliance with the terms of the decree, but if constitutional requirements have been met, termination would not be precluded. J.A. # 96–1907 at 422. The court also refused to rule on the joint motion to dismiss until after it had received updated compliance information from the independent expert monitoring the decree. Upon receipt of the compliance information, the court granted the joint motion for dismissal as to Michigan Reformatory and Marquette Branch Prison as to most issues excluding access to courts. J.A. # 96–1907 at 432–35. Following this court's decision, the parties entered into negotiations culminating in a Joint Review Process for addressing the remaining issues and a joint motion and stipulation filed with the court pursuant to FED.R.CIV.P. 60(b)(5), (6), proposing dismissal of all provisions of the *USA* decree at the Michigan Reformatory and the Marquette Branch Prison, excluding medical and mental health care. J.A. # 96–1907 at 249–364.

In its July 3, 1996 order which is the subject of this appeal, the district court addressed the joint motion for dismissal. The court ruled that it was "satisfied that the provisions with regard to sanitation, safety and hygiene; fire safety; crowding and protection from harm; access to the courts; and legal mail should be deleted from the State Plan and Consent Decree" as applied to the Michigan Reformatory and the Marquette Branch Prison, yet the court retained jurisdiction over the classification issues as to the Michigan Reformatory. J.A. # 96–1907 at 381. The court relied upon expert evaluations showing that while Michigan had maintained an acceptable range of overrides [22] in 1993 and 1994, it had fallen out of compliance in March 1995 and had not returned to compliance as of June 1996. The district court

---

**22.** Section D.1 of the consent decree requires the state prison officials to design and implement a professionally-based classification plan. J.A. # 96–1907 at 185. By order of the U.S. Court of Appeals for the Sixth Circuit dated July 2, 1991, section D.1 requires the state prison officials to

maintain the classification system override rate at a general norm of 20 percent or less. *See* J.A. # 96–1907 at 381. In other words, defendants may inaccurately classify up to 20 percent of the prisoner population should circumstances require them to do so.

expressed concern that Michigan did not maintain steady compliance and was out of compliance at the time of the court's review of the joint motion.

We have already articulated in a prior opinion in this case that the district court is not subject to the parties' stipulation with respect to termination of a consent decree component, but may exercise independent judgment regarding compliance with the decree. *See United States v. Michigan,* 18 F.3d 348, 351 (6th Cir.), *cert. denied,* 513 U.S. 925, 115 S.Ct. 312, 130 L.Ed.2d 275 (1994). The district court properly adhered to that obligation in determining that the consent decree provision dealing with the implementation of a professionally-based classification plan should remain in effect at the Michigan Reformatory. We conclude that the district court did not abuse its discretion in retaining jurisdiction over classification issues at the Michigan Reformatory.

### B. Evidentiary Record for Resolving Motion to Terminate

Michigan further contends that under the statute a motion for immediate termination of a consent decree must be considered on the record existing at the time the motion was filed, disallowing the district judge to engage in supplemental fact-finding. The state supports its argument by § 3626(b)(3)'s directive that "[p]rospective relief shall not terminate if the court makes written findings *based on the record*" (emphasis added) that relief remains necessary and narrowly drawn. That language, the inmates respond, does not mean simply the existing record at the time the motion was filed. Rather, the statute necessarily enables a district judge to examine current conditions at the prisons which become part of the judicial record, since the very task before the judge is to ascertain the existence of "a current or ongoing violation" of a federal right. As the state would have it, the district court would be forbidden from supplementing the past record in a case to determine whether a current constitutional violation exists. The Second Circuit recently adopted the prisoners' interpretation, finding it the "most sensible" construction of § 3626(b) "[g]iven that the preexisting record will rarely contain information on the 'current' state of affairs." *Benja-*

*min v. Jacobson,* 124 F.3d 162, 179 (2nd Cir.1997); *see also Thompson v. Gomez,* 993 F.Supp. 749, 755–56 (N.D.Cal.1997) ("If the existing record is not adequate to determine present circumstances, subsection (3) gives the court the power to supplement the record by taking further evidence."); *Ruiz v. Scott,* 1996 WL 932104, *8 n. 6 (S.D.Tex. Sept. 25, 1996) ("Th[e] 'record' is not necessarily limited to the record that existed prior to the filing of a motion to terminate under Section 3626(b). Rather, ... the record may include supplemental information that is presented to the court."). We note that other courts have also allowed the record to be supplemented with information on current conditions when considering a motion under § 3626(b)(2). *See, e.g., Jensen v. County of Lake,* 958 F.Supp. 397, 406–07 (N.D.Ind. 1997) (declining to terminate consent decree until after a hearing is held to determine whether ongoing constitutional violations exist); *Carty v. Farrelly,* 957 F.Supp. 727, 733 (D.Vi.1997) (relying on evidence introduced at a hearing following defendants' motion to modify or terminate consent decrees under the PLRA).

We believe this debate is premature at this juncture and should await appellate review of the lower courts' actual rulings on the termination motions. The proper evidentiary methods and materials that a district court may utilize in deciding a § 3626(b)(2) motion is a question more aptly considered when this court has before it a concrete example of how a district court actually proceeded in ruling upon a motion under § 3626(b)(2). Since we hold the automatic stay provision constitutional in light of the inherent equity powers of the courts to stay the stay if necessary, this debate does not touch upon any issue before this court at this time.

### C. Partial Stay of Phases II and III

On September 19, 1996, we issued a partial stay relieving the defendants of their obligation to implement Phases II and III of the *Hadix* decree pending this appeal. We now lift that partial stay, although we note that the parties may ask Judge Feikens to continue the stay of Phases II and III until the

district court issues a ruling on the issues remaining in this litigation.

## VI. CONCLUSION

We conclude that the 1997 amendments to the automatic stay provision, as properly construed to avoid constitutional infirmity, do not interfere with the traditional inherent powers of the courts. Since the lower courts retain the power to suspend the automatic stay in accordance with the traditional standards governing the granting of preliminary injunctions in equity, we **REVERSE** the lower court orders holding the pre–1997 automatic stay provision unconstitutional. We also **AFFIRM** the May 30, 1996 award of attorney fees entered in the *Hadix* litigation by Judge Feikens, and we **AFFIRM** Judge Enslen's decision to retain jurisdiction over the security classification system at the Michigan Reformatory. We **REMAND** for further proceedings consistent with this opinion.

ALAN E. NORRIS, Circuit Judge, concurring in part, dissenting in part.

I agree with the majority that the decisions of the district courts, which held the pre–1997 automatic stay provision of the PLRA to be unconstitutional, must be reversed because the provision, as amended, "does not give rise to an unconstitutional incursion by Congress into the powers reserved for the Judiciary." In my view, however, it is not necessary for us to construe the automatic stay provision to permit courts to "suspend the automatic stay in accordance with general equitable principles," in order to save the amended statute. As I read the statute, a district court may postpone the operation of the automatic stay once for a period of sixty days, provided that it finds good cause to do so. Nothing more is authorized by § 3626(e) and, from a constitutional perspective, nothing more is required.

Before discussing the substance of the automatic stay provision, I feel obliged to touch briefly upon the issue of mootness. Because the amendments to the automatic stay provision significantly alter the inquiry into its constitutionality, I believe that the appropriate response is to remand the matter to the district courts so that they can consider the effect of the amendments on the statute. This is the position taken by both the Justice

Department and the prisoner plaintiffs and, as the majority opinion recognizes, this is the preferred procedure in cases where a change in the law fails to extinguish the controversy.

In declining to hold that the case before us is moot, the majority explains that "because this case does not necessitate any findings of fact, the district judges' expertise in evaluating factual matters cannot advance our appellate review of this action." This conclusion ignores the obvious consideration that, since the automatic stay provision directly affects the manner in which district courts handle prison conditions cases, the ideal place to begin an inquiry into the ramifications of the provision would be in these very same courts. As the result of the amendments, for instance, district courts can postpone the effective date of the automatic stay by an additional sixty days. 18 U.S.C. § 3626(e)(3). This tripling of the original statute's time period before an automatic stay takes effect represents a significant change, and we ought not to preclude the district courts from their traditional role in helping us to determine in the first instance whether Congress exceeded its authority under the Constitution.

Finally, as the Justice Department points out, while this appeal was pending another panel of this court upheld the constitutionality of § 3626(b), the immediate termination provision of the PLRA. *Hadix v. Johnson,* 133 F.3d 940 (6th Cir.1998). That development certainly alters the legal landscape facing the district courts on remand and we should permit them the opportunity to reassess their initial decisions.

In sum, I agree with the Justice Department and the prisoner plaintiffs that this appeal is moot in light of the 1997 amendments to the automatic stay provision.

Turning to the merits, I fail to see why we need to read an "equitable exception" into the automatic stay provision in order to avoid a separation-of-powers problem. The majority contends that if district courts are limited to a one-time, sixty-day postponement of the automatic stay, the provision "violates the separation-of-powers doctrine because it amounts to a direct legislative suspension of a judicial order." It does nothing of the

kind: the suspension is neither immediate nor permanent; at all times the district court retains the authority to avoid (or, alternatively, to lift) a stay by simply complying with certain substantive provisions of the PLRA, 18 U.S.C. § 3626(b).[1] The automatic stay neither mandates a rule of decision in contravention of *Klein* nor reopens a final judgment in contravention of *Plaut.* Rather, the provision simply encourages the district court to comply with the PLRA in a timely fashion without divesting the court of the authority to decide the merits of the case.

What are the practical consequences of the automatic stay provision? First, the stay is, by definition, a temporary state that is lifted when the district court makes the factual findings required by the PLRA. While the realities of a crowded court docket coupled with the complexity of litigation related to prison conditions will occasionally make it difficult for district courts to comply with the time constraints imposed by § 3626(e), they do not make it impossible. Courts, after all, do control their own dockets and are free to impose deadlines upon parties and to shift schedules in response to evolving priorities. *See Harris v. Callwood,* 844 F.2d 1254, 1255 (6th Cir.1988) (citing *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)).

Even in the event that the automatic stay provision were triggered by inaction, the consequences are hardly as dire as the majority would have us believe. In the event that prospective relief is stayed pending the factual findings mandated by 18 U.S.C. § 3626(b), none of the improvements to prison conditions made by the State over the past decade will be jettisoned nor will prison policies relating to concerns such as health care revert to those in effect before 1985. Rather, the State will be permitted to pause in its implementation of those programs that have not been fully realized.

The automatic stay provision does not represent a way in which the State can evade its obligations. It merely allows the State to request that the *status quo* be maintained pending a factual finding by the district court that further relief is constitutionally required. Considering the lengthy span of prison litigation,[2] a relatively brief hiatus to review the continued legitimacy of extensive court-ordered relief strikes me as both constitutionally permissible and practically advisable.

Within certain limits, what Congress can create, Congress can take away. The Constitution explicitly gives Congress the power to establish "inferior Courts" and to determine the jurisdiction of those courts. U.S. Const. art. III, § 1. Even the appellate jurisdiction of the Supreme Court is, after all, subject to regulation under the Exceptions Clause. U.S. Const. art. III, § 2, cl. 2.; *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1868); *see* Gerald Gunther, *Congressional Power to Curtail Federal Court Jurisdiction,* 36 Stan. L.Rev. 895, 908 (1984). Once jurisdiction is conferred, of course, Congress must permit the courts a "meaningful" opportunity to decide the case. In my view, the automatic stay provision does not, as the majority would have it, implicate "the integrity and fairness of judicial decisionmaking." Rather, it merely represents a permissible exercise of Congress' undisputed authority to establish regulations governing the manner in which inferior federal courts operate.

Finally, the majority's invocation of the doctrine of separation-of-powers seems especially ironic, since Congress enacted the PLRA in part due to a perception that federal courts flouted the doctrine by assuming control over prisons. The majority now lectures Congress that it need not have concerned itself with that aspect of the doctrine.

---

1. These substantive provisions have been upheld in the face of constitutional challenge by several circuits, including, as mentioned earlier, our own. *See Hadix v. Johnson,* 133 F.3d 940 (6th Cir.1998); *Dougan v. Singletary,* 129 F.3d 1424 (11th Cir.1997); *Inmates of Suffolk County Jail v. Rouse,* 129 F.3d 649 (1st Cir.1997); *Benjamin v. Jacobson,* 124 F.3d 162 (2d Cir.1997); *Gavin v. Branstad,* 122 F.3d 1081 (8th Cir.1997); *Plyler v. Moore,* 100 F.3d 365 (4th Cir.1996).

2. Many consent decrees dealing with prison litigation, including those before us, have been in effect for more than a decade. *See, e.g., Dougan,* 129 F.3d at 1425 (since 1983); *Suffolk County Jail,* 129 F.3d at 653 (since 1979); *Benjamin,* 124 F.3d at 165 (since 1978–79); *Gavin,* 122 F.3d at 1084 (since 1984); *Plyler,* 100 F.3d at 369 (since 1986).

Perhaps the lesson to be drawn by Congress is that the only side that matters is our side—that while federal courts may encroach upon the prerogatives of the legislative and executive branches (not to mention those of the States), Congress dare not tinker with ours.

For the reasons just outlined, I concur in the decision to reverse the decisions of the district courts below, but dissent with respect to the reasoning. I also concur in the majority's resolution of the award of attorney fees by Judge Feikens and of Judge Enslen's decision to retain jurisdiction over security classification.